JjWILLIAMS, J.
The petitioner, Louisiana State University Health Sciences Center (“LSUHSC”), and the respondent below, Joseph Butler (“Butler”), appeal[1] a judgment committing Butler to inpatient treatment. Initially, the trial court signed a consent judgment between LSUHSC and Butler, committing Butler to outpatient treatment. However shortly thereafter, the trial court reopened Butler’s case, vacated the consent judgment for outpatient treatment and signed a judgment committing Butler to the Louisiana Department of Health and Hospitals (“DHH”) for long term placement. The court ordered Butler to remain at LSUHSC in Shreveport, Louisiana on an inpatient basis until he could be placed. For the following reasons, we reverse the judgment of the trial court and commit Butler to outpatient treatment.
FACTS
On September 16, 2004, LSUHSC filed a petition for formal commitment.[2] LSUHSC alleged that Butler was admitted to its care under an emergency certificate on September 1, 2004. Butler had been independently examined by the coroner, who had executed an emergency certificate dated September 3, 2004, which expired on September 16, 2004. LSUHSC alleged that Butler was suffering from mental illness and was gravely disabled. According to LSUHSC, Butler was unable to provide for his own basic needs and unable to seek voluntary admission for treatment.
|aTo support the allegations of its petition, LSUHSC gave the following brief summary of Butler’s mental health and criminal background as taken from the report of Butler’s treating physician, Dr. Syed Munir:
Mr. Joseph Butler is a 27-year-old African-American male with a history of bipolar disorder. He was admitted on an OPC by [a] family member because patient was walking the street, talking nonstop and very manic. Patient reportedly has not been sleeping. He has recently been released from jail, Caddo Correctional. Patient reportedly had gone into a store and walked away with some merchandise and he was arrested. Patient has multiple histories of incarceration in the past. He has been non-compliant with his medication in the past and has multiple admissions to LSU. He had a psychological testing done in 1999 and is currently being tested psychologically again. He has been taking his medication reluctantly. He has been very intrusive, loud and hostile on the unit, but has settled down with the use of antipsychotic [medication]. The treating physician is requesting the court [sic ] that he be committed to out *761 patient treatment when he is discharged from [the] hospital.
In its petition, LSUHSC requested that Butler be examined by an independent physician and it be granted an order to detain Butler until the completion of his commitment hearing. The trial court granted both requests and appointed Dr. Juliana Fort to examine Butler. After her examination, Dr. Fort recommended that Butler be released and treated on an outpatient basis.
On the morning of September 29, 2004, LSUHSC and Butler informed the trial court that they had reached an agreement for Butler to obtain outpatient treatment at Northwest Regional Center for Addictive Disorders and Shreveport Mental Health Center. The trial court signed the consent judgment, committing Butler to outpatient treatment. After Butler’s hearing, the trial court continued with other commitment hearings. At the completion of the hearings, the trial court was approached by Louis Butler 18(“Mr. Butler”), Butler’s father. According to the trial court, Mr. Butler appeared to be upset; Mr. Butler stated that LSUHSC’s counsel had promised him that he would be allowed to testify. Mr. Butler also stated that he could not “handle” Butler and his son needed inpatient treatment.[3]
The trial court stated that when the parties stipulated to outpatient treatment, it approved the agreement because LSUHSC’s counsel stated that the treating physician had recommended outpatient treatment for Butler. The trial court stated that after reviewing the petition, Butler’s incoming report and Dr. Munir’s report, as well as speaking with Mr. Butler, it decided that “the- complete picture” of Butler’s history had not been presented to the court when the stipulation was made and that the matter was being reopened.
The trial court then proceeded to conduct a second hearing and to call witnesses. Butler’s father was the first witness called by the trial court. Mr. Butler testified that his son had a history of bipolar disorder, as a result of an untreated head injury from an accident in 1996. He testified that after Butler’s injury, Butler exhibited odd behavior such as slowly responding to questions, speaking incoherently and going to other individuals’ houses and sitting on their porches or staring into their houses.. Mr. Butler testified that when Butler would demonstrate this behavior, Mr. Butler would go and get Butler, who acted as if he did not know where he was or what he was doing. |4Mr. Butler further testified that because of Butler’s odd behavior, he feared for Butler’s safety and the safety of others.
According to Mr. Butler, in September or October of 2002, Butler was taken to LSUHSC Hospital for treatment; at this admission, Mr. Butler was- informed that Butler was bipolar. Mr. Butler testified that he told the doctor that Butler had not slept in four days and that someone constantly had to watch him. Mr. Butler further testified that he, Butler’s mother and his other son worked at night and that when he arrived at home in the morning, he would spend a couple of hours looking for Butler.
Mr. Butler .testified that Butler had been taking Zyprexa for at least a year and a half. According to Mr. Butler, Butler would take his medicine only until his *762 condition improved and he could not force Butler to take his medication. He testified that Butler would become agitated when instructed to take his medication and had cursed his mother and threatened to kill everyone in the house. Mr. Butler further testified that since 1996, Butler had been going to the Shreveport Mental Health Center. Butler would keep his appointments regularly for a period of time, but eventually he would stop keeping his appointments.
Mr. Butler testified that Butler had been convicted and sentenced to serve one year in Caddo Correctional Center (“CCC”) for “swinging a gun after he was slapped.” He was also arrested for a parole violation and convicted of going behind a store counter and drinking sodas for which he was unable to pay. Mr. Butler testified that after Butler was released from jail for the store incident (in September 2004), Butler went to a service 1 (¡station and started drinking sodas there. Mr. Butler testified that when the police recognized Butler from his previous offense, they brought Butler home. He then took Butler back to LSUHSC Hospital. Mr. Butler testified that Butler neither hurt himself nor anyone else during any of the incidents.
Mr. Butler testified that prior to Butler’s head injury, Butler could take care of himself; however, after the head injury, Butler was incapable of living on his own (ie., finding housing and employment) without some professional help. Mr. Butler testified that he inquired into treatment for Butler at the Shreveport Mental Health Center and Harmony House. According to Mr. Butler, Butler attended sessions twice a week at the Shreveport Mental Health Center for substance abuse and mental health. He testified that before a Harmony House representative could help them commit Butler, he was sent to jail.
Mr. Butler testified that Butler’s behavior has improved since his admission to LSUHSC Hospital and that at trial, it appeared as if Butler was “as good as he gets” with the aid of medication. He testified that if Butler was released and ordered to go to the Shreveport Mental Health Center, Butler would not follow the order to go or to take his medication. Mr. Butler stated that Butler needed some type of professional help in a structured environment on a long term basis, which would entail counseling or therapy.
Dr. Munir was the second witness called by the trial court. He testified that he had been Butler’s treating physician since September 3, | fi2004. Dr. Munir testified that at Butler’s initial evaluation, Butler originally told him that he was in jail for two and one-half months for stealing a styro-foam cup, but Butler later added, “The cup had a drink in it and he stole the cup.”
Based on his review of Butler’s medical chart, Dr. Munir testified of Butler’s mental health history dating back to 1997. He testified that in 1999, Butler was admitted to LSUHSC Hospital where he underwent psychological testing, which indicated that his IQ was borderline. Dr. Munir testified that at that time, Butler was diagnosed with substance abuse and possible bipolar disorder. Dr. Munir testified that Butler had been prescribed Zyprexa and Lithium for bipolar disorder. According to Dr. Munir, Butler was taken off Lithium after somatic complaints, but continued to take Zyprexa for his psychotic and manic symptoms. He noted that Butler’s symptoms were more manic than psychotic.
Dr. Munir testified that a CT scan performed on Butler on September 9, 2004 was normal. He diagnosed Butler with bipolar one, a condition which involves mood disorder and manic symptoms, such as problems with talking, sleeping, intrusive behavior and compulsive behavior.
*763 Dr. Munir testified that he agreed with the summation of Butler’s background as presented in the petition filed by LSUHSC. He testified that Butler had been taking his medicine reluctantly because Butler did not want to take Lithium. Dr. Munir agreed that Butler had been very intrusive by going into businesses. He testified that on the previous Saturday (approximately three to four days before the hearing), Butler was improper |7with a female patient and was sent to another wing. Dr. Munir agreed that Butler talked loudly, but testified that this behavior had ceased. He also agreed that Butler was hostile when he entered the unit and there was difficulty in directing Butler to his section. Dr. Munir added that during the time that he has treated Butler, Butler has never hurt anyone or himself. Dr. Munir opined that Butler was not a danger to himself or others.
Dr. Munir testified that Butler was capable of providing for himself; however, he opined that Butler was gravely disabled because if Butler did not take his medication, his condition would deteriorate. Dr. Munir further opined that Butler’s grave disability for substance abuse and mental illness could be treated on an outpatient basis. He testified that Butler was stabilized on his medication and Butler would not benefit any further from the acute care at LSUHSC Hospital. Dr. Mu-nir recommended that Butler be immediately released on an outpatient basis.
Carolyn Butler (“Mrs. Butler”), Butler’s mother, was the next witness called by the trial court. Mrs. Butler testified that pri- or to Butler’s admission to LSUHSC Hospital, Butler lived with her and her oldest son Louis. She testified with regard to Butler’s inappropriate and bizarre behavior such as walking around with hardly any clothes on, constantly talking to himself, wandering around in the neighborhood, going to strangers’ homes and sitting on their porches, and threatening to shoot her and other family members. Mrs. Butler testified that last year, Butler slapped his brother without any reason and that this year, he pushed his | ¿father when his father asked him to take his medicine. Mrs. Butler testified that she feared for Butler’s safety and the safety of others.
Mrs. Butler also testified with regard to the store incident where Butler was arrested and jailed for getting an item for which he did not pay. Mrs. Butler stated that Butler committed the same act after he was released from CCC. According to Mrs. Butler, the police brought Butler home; however, because Butler was not at home when she arrived from work, she again called the police and they placed an APB out for him. Mrs. Butler testified that when Butler later returned home, she and Mr. Butler brought him to LSUHSC Hospital.
According to Mrs. Butler, her son did not take his medications regularly. She testified that she would not feel safe if Butler was released and returned home. She felt that she would have to bring Butler back to LSUHSC Hospital because he would not take his medication. She further testified that if Butler came home and refused to take his medication or to go to the Shreveport Mental Health Center, she could not force him to comply.
Mrs. Butler testified that Butler was incapable of living on his own. She testified that she prepared the majority of Butler’s meals and that if he did not live with her, Butler would not be able to get a job and provide for himself, obtain housing and maintain its upkeep or take care of his clothing and appearance. Mrs. Butler also testified that Butler was not receiving any financial assistance for his mental illness. She testified that if Butler was Lproperly *764 medicated, he was capable of working and having a sustained income.
Mrs. Butler testified that she visited Butler at LSUHSC Hospital and observed an improvement in his behavior, noting that he could hold a conversation, had a better approach and interaction and did not threaten her. She testified that if Butler was to remain in the hospital, she wanted the hospital to place him in a group home. Mrs. Butler testified that Butler needed supervision to make him take his medication and to teach him how to take care of himself. She further testified that she could not handle Butler at home and she feared that if he came home and did not take his medication, he would threaten to harm her.
Counsel for LSUHSC called Gwynne Smith, a social worker/case manager at LSUHSC Hospital, as a witness. Smith testified that she researches the various placements for patients and recommends the availability of treatment options in the community to the doctors. She testified that she has previously worked with Butler and felt that his condition had improved.
According to Smith, when LSUHSC has a patient committed, the patient is committed to DHH. Smith testified that DHH did not have any group homes for the mentally ill in the Shreveport-Bossier City area or in the surrounding areas, although there were private group homes. Smith testified that when a person is committed to DHH, LSUHSC submits a packet to the Shreveport Mental Health Center (under the Office of Mental Health), and the person is placed on a waiting list for a private group home placement. Smith testified that since state facilities were no longer | inaccepting patients for long term treatment, the patient usually remained at LSUHSC Hospital while waiting for a group home placement. Smith testified that if a person was committed, the only treatment available was a LSUHSC Hospital bed or outpatient commitment. According to Smith, there were fifty-one beds in the psychiatric unit at LSUHSC Hospital and these were presently full; furthermore, there was a waiting list for new patients.
Smith testified that occasionally, a patient with Medicaid is referred to the Mental Health Rehabilitation Center, where the patient would be assigned a case manager and a nurse who would give the patient his daily medication. Smith concluded that since Butler did not have Medicaid, he would either remain at LSUHSC Hospital until he was discharged or go to outpatient treatment at Shreveport Mental Health Center for mental illness and Northwest Regional Center for Addictive Disorders for substance abuse.
Smith testified that in an acute care facility such as LSUHSC Hospital, the patients see a doctor, get their medication and attend group sessions and recreational therapy; there was no individual therapy or drug abuse treatment program. Smith further testified that in LSUHSC Hospital, the focus was on stabilizing the patient on his medication and there was no further treatment available after stabilization. Smith added that if a patient refused to take his medication, the doctor could force the patient to take his medication after obtaining a second opinion.
I^The trial court issued an instanter subpoena for Felicia Fuller, a LPN at the psychiatric unit of LSUHSC Hospital. Fuller testified with regard to the Saturday incident where Butler was inappropriate with a female patient. According to Fuller, she received a report that Butler and the female patient had been hiding behind the day room door on the “G” wing. Fuller testified that she went to the day room and observed through the cracked door that Butler was “real close” to the *765 female patient. She testified that she redirected Butler from the day room because there was a general rule against relationships between patients. Fuller felt that since Butler and the female patient became angry when she split them apart, their behavior was consensual. Fuller testified that Butler started speaking loudly and cursing. She testified that she informed Butler’s nurse about his conduct and he was moved to another wing. Fuller presumed that the wing change was due to Butler’s loud and inappropriate behavior.
At the conclusion of the hearing, the trial court tore up the signed consent judgment, and ruled that the judgment was vacated based upon the testimony presented during the second hearing. The trial court stated that the first judgment was rendered without sufficient information from the attorneys. The trial court concluded that Butler had not been sufficiently stabilized to be released on an outpatient basis. It found that there was clear and convincing evidence that Butler was gravely disabled and was, and continued to be, a danger to himself and to others. The trial court then stated that it was “extremely disturbed” that counsel for LSUHSC and Butler had not presented the facts testified to at the second hearing when | n>they made their stipulation for outpatient treatment at the first hearing. The trial court then signed a judgment which committed Butler to DHH and ordered Butler to remain at LSUHSC Hospital for inpatient treatment. LSUHSC and Butler jointly appeal the trial court’s judgment.
DISCUSSION
LSUHSC and Butler contend the trial court improperly committed Butler to inpatient treatment at LSUHSC Hospital. In their joint brief, LSUHSC and Butler argue that there was no reasonable factual basis to support a judgment of inpatient treatment and the trial court’s judgment was clearly wrong. In his supplemental brief, Butler argues that the trial court’s judgment of commitment deprived him of his right to be treated in the least restrictive placement and his right to an active and appropriate treatment.
In State in the Matter of B.W., 566 So.2d 1094 (La.App. 2d Cir.1990), this Court stated:
A judicial commitment of a mentally ill person pursuant to LSA-R.S. 28:54 is a civil exercise of the state’s police power. It is neither a criminal proceeding nor a formal interdiction proceeding affecting the property rights of the person committed. Before the respondent may be subjected to a judgment of civil commitment, the petitioner must show by clear and convincing proof that respondent is dangerous to himself or to others or is gravely disabled as a result of substance abuse or mental illness. By clear and convincing evidence is meant a standard more than a “preponderance” but less than “beyond a reasonable doubt.” Therefore, the evidence at a commitment proceeding must establish at least one of three statutory justifications for institutionalization. Along with the statute, federal constitutional guarantees also mandate an enhanced level of proof. Because a person is deprived of liberty by involuntary commitment, the evidence must be reviewed for strict adherence to the high standard of proof required by constitutional and statutory law, notwithstanding the great weight appellate courts must give to the trial court’s factual findings. Although the lower court’s findings are entitled to great weight, the appellate court must, considering l1sthe constitutional rights involved, review the evidence presented *766 and strictly require that it meet the high standards enunciated by law.
LSA-R.S. 28:2(10) defines “gravely disabled” as the condition of a person who is unable to provide for his own basic physical needs, such as essential food, clothing, medical care and shelter, as a result of serious mental illness or substance abuse and is unable to survive safely in freedom or protect himself from serious harm. “Dangerous to others” is defined as the condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future. LSA-R.S. 28:2(3). “Dangerous to self’ is defined as the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person. LSA-R.S. 28:2(4).
If the court finds by clear and convincing evidence that the respondent is dangerous to himself or others or is gravely disabled as a result of substance abuse or mental illness, the court shall render a judgment for his commitment. After considering all relevant circumstances, including any preference of the respondent or his family, the court shall determine whether the respondent should be committed to a treatment facility which is medically suitable and least restrictive of the respondent’s liberty. LSA-R.S. 28:55(E) (1); See LSA-R.S. 28:2(29)(a) (defining the term “treatment facility”), LSA-R.S. 28:25 (providing for the close confinement of mental patients) and LSA-R.S. 28:23 (providing for psychiatric inpatient units in 114state general hospitals for temporary and emergency care). A patient admitted to a treatment facility has the right to have available such treatment as is medically appropriate to his condition. Should the treatment facility be unable to provide an active and appropriate medical treatment program, the patient shall be discharged. LSA-R.S. 28:171(R).
This Court has rejected a strict reading of LSA-R.S. 28:55(E)(1), finding that this provision does not mandate commitment to a treatment facility. If medically suitable treatment may be secured without institutionalization, then the trial court is not prohibited by the statute from ordering such treatment. In the Matter of L.M.S., 476 So.2d 934 (La.App. 2d Cir. 1985). The trial court may conditionally discharge the respondent. “Conditional discharge” means the physical release of a judicially committed person from a treatment facility by the director or by the court. The patient may be required to report for outpatient treatment as a condition of his release. LSA-R.S. 28:2(1).
In the instant case, LSUHSC and Butler challenge the trial court’s order of inpatient treatment for Butler at LSUHSC Hospital. Therefore, LSUHSC and Butler must show that Butler’s commitment to inpatient treatment at LSUHSC Hospital is not medically suitable and is not the least restrictive treatment.
Mr. Butler testified that Butler would take his medication, but Butler would stop when he felt better. He testified that he could not force Butler to take his medication when he was well. Mr. Butler testified that if Butler was released and ordered to go to the Shreveport Mental Health Center, 1 ^Butler would not follow the order or take his medication. Mr. Butler felt that his son needed long term treatment in a structured environment. Further, Mrs. Butler testified that she could not handle her son, and Butler did not regularly take his medicine. She testified that if Butler refused to take his medicine or refused to return to the Shreveport Mental Health Center for out *767 patient treatment, she could not force him to comply.
Contrary to the testimony of Butler’s parents, Dr. Munir testified that although Butler was gravely disabled as a result of substance abuse and mental illness, his disability could be treated on an outpatient basis. Dr. Munir opined that Butler was stabilized on his medication and that he would not benefit any further from the acute care at LSUHSC Hospital. Dr. Mu-nir recommended Butler’s immediate release on an outpatient basis. Dr. Fort, the court-appointed expert, concurred with Dr. Munir’s recommendation that Butler receive outpatient treatment. Smith testified that LSUHSC did not have an individual therapy or drug abuse program as recommended by Dr. Munir for Butler’s treatment. Smith testified that in an acute care facility such as LSUHSC Hospital, the focus was on stabilizing the patient on medication, and there was no further treatment available after stabilization. Moreover, Smith testified that currently all of the beds in the psychiatric unit of LSUHSC Hospital were filled and there was a waiting list for new patients.
After a thorough review of this record, we find that the trial court violated the provisions of Title 28 of the Louisiana Revised Statutes by ordering Butler’s commitment to inpatient treatment at LSUHSC Hospital.
I^The trial court concluded that because Butler was a danger to himself and to others and was gravely disabled, he was not a candidate for outpatient treatment. However, under LSA-R.S. 28:55(E)(1), the trial court was required to commit Butler to a treatment facility that was medically suitable and least restrictive of his liberty. Furthermore, by committing Butler to inpatient treatment at LSUHSC Hospital, the trial court violated Butler’s right under LSA-R.S. 28:171(R) to be admitted to a treatment facility that can provide medically appropriate treatment for his condition.
Accordingly, we reverse the judgment of the trial court and hereby commit Joseph Butler to outpatient treatment at Shreveport Mental Health Center for mental illness, and Northwest Regional Center for Addictive Disorders for substance abuse.
REVERSED AND RENDERED.

. LSUHSC and Butler filed a joint brief. Butler also filed a supplemental brief.

. In the petition, LSU Medical Center is named as the petitioner. However, at the hearing and thereafter, LSUHSC is named as the petitioner.

. Mr. Butler testified that prior to the date of the hearing, he had not spoken with counsel for LSUHSC or Butler. He testified that Butler’s doctor and social worker had informed him and his ex-wife that the judge would likely place B.utler in an outpatient treatment center. Mr. Butler further testified that no one had spoken with him about the agreement for outpatient treatment.